David LEVER, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 64 Civ. 1559.

United States District Court
S. D. New York.

July 15, 1969.

Sol Lefkowitz, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for the United States; Samuel M. Eisenstat, Michael D. Hess, Asst. U. S. Attys., of counsel.

## OPINION

HERLANDS, District Judge:

This case arises out of a series of surgical procedures performed on David Lever, the plaintiff, while he was a patient at the Manhattan Veterans Administration Hospital (MVAH) in 1962. Jurisdiction is based on the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (1964), and 28 U.S.C. § 1346 (1964).

After trial of the action to the Court, sitting without jury, the Court reserved decision on defendant's motion to dismiss on the ground that plaintiff failed to prove a cause of action by a fair preponderance of the credible evidence. (Trial Transcript at 779, hereinafter referred to by page number). The Court hereby grants defendant's motion and orders that the complaint be dismissed with prejudice and that final judgment be entered for defendant, with costs.

## FACTUAL BACKGROUND OF THE CASE

Plaintiff, a veteran, 74 years of age during the period of time relevant to this case, was examined on February 15, 1962 by Nathan Newman, M.D., then a second-year resident at MVAH, in connection with plaintiff's complaints of urinary frequency. He was instructed to report to MVAH on February 27, 1962, to be admitted as a patient and undergo a urological survey. (Deft.Exh. A at 2 [the MVAH hospital record]).

On February 27, 1962, plaintiff was examined by David McKee, M.D. who reported the presence of bilateral direct inguinal hernias and a 15–20 gram benign prostate. (Dept.Exh. A at 3).

Aaron Hardy Ulm, M.D., who was Chief of Urology at MVAH during the years 1954–66 (Ulm 8), including the year 1962, gave general background testimony with respect to the physiology of the relevant part of the anatomy and a non-technical explanation of the medical problem affecting Mr. Lever and the type of operation planned to alleviate his condition.

The prostate gland plays a role in the male reproduction process. That is its only known function. It is located at the point where the urethra joins the bladder and completely encircles the urethra. As a person grows older, the prostate gland sometimes becomes the seat of various tumors, and tends to enlarge. Because it surrounds a tube-like structure (urethra), its growth causes a compression of that tube. In turn, the compression of the urethra makes the urinary stream thinner and prevents the complete voiding of the bladder, thus causing urinary frequency. (Ulm 23–24).

Two general procedures have been developed to correct this condition. The first (and earlier) method involves an incision into the body—suprapubically, retropubically, or perineally—and enucleation of the enlarged prostate by the surgeon's finger. (Ulm 24–25). The other (and more recently developed) method utilizes various surgical instruments which are inserted into the patient's urethra and bladder through his penis.

The instruments used (Deft.Exh. J is an example) include a cystoscope and panendoscope, which are observation instruments of a telescopic nature. The cystoscope gives a right-angle view while the panendoscope gives a straight-forward view.

Once these larger instruments (of a tubular shape) are inserted, the Stern-McCarthy operating unit is introduced. This contains another telescopic unit (resectoscope), a light source, and a wire loop. The surgeon looks through the telescope, advances the wire loop to protruding prostatic tissue, catches the tissue in the loop, pulls the loop back and simultaneously introduces an electrical current into the loop which cuts a cylinder of tissue. The process is repeated until the surgeon determines that a sufficient amount of tissue has been resected. The operating instrument also utilizes another electrical current (of a different frequency) through the wire loop to coagulate blood vessels which are transected in the ordinary course of this procedure. This prostatectomy is called a transurethral resection of the prostate and is commonly referred to by doctors as a "TURP". (Ulm 25–33).

Generally speaking, smaller prostate glands are better for the transurethral operation; and, while there is considerable difference of opinion concerning the relative safety of the two described operations, a transurethral resection has the great advantage of avoiding cuts in the body. (Ulm 27).

In order to determine which procedure to follow in a specific case, and whether a particular patient is suitable for a transurethral resection, a preliminary inspection of the area is performed with a cystoscope and panendoscope. (Ulm 26–26).

Plaintiff underwent such a cystopanendoscopy on March 1, 1962. This procedure was performed by Dr. Panetta. (Deft.Exh. A at 126).

On March 7, 1962 Dr. Nathan Newman performed a transurethral resection of the prostate upon plaintiff, resecting approximately 10 grams of tissue from a gland whose estimated size at the outset of the procedure was 20 grams. (Deft. Exh. A at 128).

On March 27, 1962, plaintiff experienced two episodes of bleeding bright red from the penis at approximately 6:40 A.M. At 1:00 P.M., Dr. Martin Ill, the third-year resident at MVAH, performed a surgical procedure to evacuate blood clots from the bladder and to discover and control hemorrhage. Dr. Ill evacuated the clots and conducted a fruitless search for a bleeding vessel. He then resected residual tissue on the floor of the prostatic urethra. Blood was observed to be mildly oozing from several areas in the prostatic fossa and especially in the area of the bladder neck which was observed to be undermined. Dr. Ill fulgurated (electrocoagulated) these areas and inserted a catheter to continue irrigating and emptying the entire area. Three units of blood were given. (Deft.Exh. A at 132).

On March 29, 1962, at approximately 7:40 P.M., plaintiff was observed to have a "gross hematuria" (massive hemorrhage). (Deft.Exh. A at 94). Dr. Newman noted at 7:45 P.M. a massive sudden prostatic and urethral hemorrhage following a bowel movement. (Deft.Exh. A at 111).

After various futile attempts at controlling this bleeding, and an estimated blood loss of 500 cc's in fifteen minutes, plaintiff was brought to the operating room. Plaintiff's blood pressure had dropped to sixty over forty; 1000 cc's of whole blood were administered and another 500 cc's were evacuated from his bladder. A cystopanendoscopy was performed at approximately 8:45 P.M. by Dr. Ill, and arterial bleeding was reported. (Id.).

After anesthesia was administered, Dr. Ill performed a transurethral electrocoagulation of the bleeding vessels by means of a resectoscope. The instruments were inserted about 9:10 P.M. and the fulguration was completed at approximately 9:20 P.M. (296). Dr. Ill reported that the bleeding then stopped almost entirely. The fossa was then cleaned of clots and a catheter was left in place. (Deft.Exh. A at 111, 128–29).

Thereafter, plaintiff was incontinent. On May 22, 1962 Dr. Ulm, assisted by Drs. Ill and Newman, performed an operation on plaintiff to repair his bilateral direct inguinal hernias and to attempt at curing his incontinence. In the course of this procedure, a bilateral orchiectomy was performed and the spermatic cords were pulled through and posterior to the membraneous urethra, thus forming a cross-sling. The latter procedure was the attempt at incontinence repair. (Deft.Exh. A at 133–34). Plaintiff's hernia condition was corrected, though his incontinency was not.

On October 5, 1962, plaintiff was discharged from MVAH with an unimproved incontinency condition. On July 9, 1963, he was admitted to the Albany Veterans Administration Hospital where he underwent an operation (on July 18, 1963) in another attempt at incontinency cure. The operation involved the implantation of a Berry prosthesis. (Deft.Exh. B at 189 [Albany Veterans Administration Hospital record]). This operation was not successful in curing plaintiff's incontinency.

On March 2, 1967, plaintiff was admitted to Bronx Veterans Administration Hospital; and, on March 27, 1967, the Berry prosthesis implanted in July, 1963 was excised and replaced by a modified Berry prosthesis. (Deft.Exh. E at 355 [Bronx Veterans Administration Hospital record]). This operation likewise did not cure plaintiff's condition. He is apparently incontinent at this time. (Lever 215).

## PLAINTIFF'S CONTENTIONS

Plaintiff's contentions, as set forth in the pre-trial order and in his Post-Trial Brief are as follows:

(1) Defendant was negligent in permitting Dr. Newman, an inexperienced person, to perform the March 7, 1962

transurethral resection upon plaintiff without close supervision. Dr. Newman performed this procedure with a lack of skill, leaving an excessive amount of tags in the residual prostate tissue, which prevented proper and prompt healing, and caused continued bleeding.

(2) Defendant was negligent in permitting Dr. Ill, an unskilled, inept, and not properly trained person to operate upon plaintiff. Moreover, defendant was negligent upon a theory of respondeat superior in that its agent, Dr. Ill, acted contrary to generally accepted medical practice and failed to exercise his best judgment with respect to the surgical procedure of March 27, 1962. More specifically, plaintiff contends that Dr. Ill should have merely controlled the bleeding and should not have resected additional tissue because a second stage prostatectomy—an elective procedure—was contraindicated for a patient suffering from hemorrhage, anemia and fever. As a proximate result of Dr. Ill's resection of March 27, 1962, plaintiff bled still more, thereby causing the hemorrhaging of March 29, 1962.

(3) Dr. Ill was negligent with respect to the surgical procedures of March 29, 1962 because, as a result of his inexperience, he mistakenly believed that plaintiff was undergoing massive hemorrhaging in the area of the verumontanum and sphincter, and was thus in a life-or-death situation. Acting on this mistaken belief that plaintiff was in a life-threatening emergency, Dr. Ill wrongly failed to call an experienced member of the attending staff, though there was sufficient time to do so. Moreover, Dr. Ill deliberately destroyed plaintiff's external sphincter and failed to perform the more advisable and conservative operation to control the bleeding—namely, suprapubic packing of the prostatic fossa —because of the erroneous belief respecting the hemorrhaging. Furthermore, Dr. Ill employed an unskillful and faulty technique in electrocoagulating the blood vessels in that he fulgurated extensively and persistently rather than lightly or not at all. As a proximate re-

sult of these errors and acts of malpractice, plaintiff's sphincter was permanently destroyed, thereby rendering him incontinent.

(4) Dr. Ulm was guilty of malpractice with respect to the operation of May 22, 1962 in that he performed a bilateral orchiectomy, though plaintiff's testicles were healthy. Dr. Ulm also departed from generally accepted medical standards when he performed on plaintiff an operation which was unreported in medical literature and novel and experimental in nature, without having obtained plaintiff's informed consent. As a result of these acts, plaintiff suffers from mental and physical pain and anguish stemming from the orchiectomy. Moreover, performance of Dr. Ulm's operation diminished the likelihood of success of the Berry operation performed in July, 1963 at the Albany VA Hospital, and the Berry operation performed in March, 1967 at the Bronx VA Hospital.

## THE TRIAL TESTIMONY

At the trial, plaintiff offered the following testimony: Mr. Lever gave testimony relating to his personal background and his pain and suffering following his discharge from MVAH. He gave no testimony of note with respect to the March, 1962 procedures, but did give his version of the discussions with Dr. Ulm regarding the May, 1962 operation. This latter testimony will be analyzed in greater detail in Part IV(A) *infra*, wherein the Court discusses the May 22, 1962 operation.

Plaintiff then offered the expert testimony of Dr. Leonard Biel. In the middle of his direct examination, plaintiff's counsel saw fit to attempt to impeach this witness (Biel 324) by confronting him with a report he had sent plaintiff's counsel with a transmittal letter dated October 20, 1967. (Pltf.Exhs. 11, 12). That report was headed: "Draft of Conclusions After Reviewing the Chart on David Lever While At The New York Veteran's Administration Hospital in 1962." He also offered this report

(Pltf.Exh. 11) as substantive proof. (Biel 339–40).

Plaintiff offered the testimony of Dr. Joseph E. Davis, Jr., who gave expert opinion evidence as to the March 27th procedure (Davis 396), as to the March 29th procedure (Davis 398–99) and the May 22nd procedure. (Davis 399–400).

Plaintiff also read parts of Dr. Ill's deposition into the record as proof of some of his contentions. And, after Dr. Newman testified as a fact witness for defendant, plaintiff examined him as a fact and expert witness on his own behalf. (Newman 501, 513).

Finally, plaintiff relies in part on portions of Defendant's Exhibits A and B —plaintiff's hospital records while a patient at MVAH and Albany VA Hospital —and proof elicited from defendant's experts on cross-examination.

Defendant offered the expert testimony of Dr. Ulm and Dr. Simon A. Beisler, who was Chief of Urology at Vanderbilt Urological Clinic of the Columbia Presbyterian Medical Center from 1929–1935, and at Roosevelt Hospital from 1938–1966. (Beisler 619–20). In addition, defendant offered the factual testimony of Dr. Newman with respect to certain of plaintiff's contentions.

## I. THE MARCH 7, 1962 OPERATION

It is not entirely clear that plaintiff still presses his contentions with respect to this operation; his Post-Trial Brief does not analyze any of the evidence bearing on these particular issues. Nevertheless, the Court has considered the evidence with respect to these contentions and concludes that the weight of the credible evidence manifestly requires their rejection.

### A. Was Dr. Newman Inexperienced?

█ Dr. Newman received his M.D. degree in 1957. (Newman 514). He completed one year's residency in surgery and a six-months' pathology residency prior to 1960. During March, 1962, he was near the end of his second year of urology residency at MVAH. (Newman 513). He had been licensed to practice medicine in New York State in 1960. (Newman 514).

During his second year of urology residency, Dr. Newman performed between 50 and 75 transurethral operations. (Ulm 92). There is nothing in the record to indicate that Dr. Newman was inexperienced in the performance of transurethral operations. In the absence of such testimony, the Court concludes that Dr. Newman's background establishes him as an experienced surgeon in March, 1962.

### B. Did Dr. Newman Perform the March 7th Operation Without Adequate Supervision?

█ Plaintiff presumably relies on the absence of any notation in the report of the March 7th operation indicating that either Dr. Ill or Dr. Ulm was present during this operation by Dr. Newman (Deft.Exh. A at 128), to sustain his claim of inadequate supervision. However, Dr. Ulm's testimony with respect to the established routine and practice at MVAH in 1962 overcomes any such inference. Dr. Ulm testified that, while he had no independent recollection of being physically present during the March 7th procedure, assuming he had followed the established routine and practice, he would have been present, especially in view of the fact that the operation was performed in the morning and by a second-year resident. (Ulm 52–53).

Moreover, Dr. Ulm testified that the general routine and practice followed at MVAH was to have the third-year resident supervise all TURPs performed by a second-year resident and that this supervision was "unvarying". (Ulm 38; 39; 56).

Dr. Ulm then explained in what sense he used the term "supervised". He also described the routine practice and established procedure with respect to the MVAH process of supervision of transurethral prostatectomies performed by second-year residents. The operating surgeon would begin the operation and the senior man looked over his shoulder into the telescopic unit and showed the

operating surgeon what to do. The resectionist would cut a bit and would inquire of the supervising doctor as to the appropriate technique to be followed at a particular point. (Ulm 54). The transurethral prostatectomy is an operation where the senior man interrupts the performing surgeon from time to time in order to take a look at the surgeon's progress. (*Id.*). While the senior man cannot watch the surgery because the operation is in the depths of the human body, the senior does check the operating surgeon periodically. (*Id.*). The Court finds such supervision to be proper and adequate.

C. Did Dr. Newman Perform the Operation With A Lack of Skill or Otherwise Improperly?

■ There is no evidentiary basis to plaintiff's contention that Dr. Newman performed the March 7th procedure unskillfully for the asserted reason that he left an excessive amount of tags in the prostate tissue. Nothing in the record indicates that Dr. Newman left tags in the prostate tissue, or, if he did that they were excessive.

Dr. Ill testified that he found a substantial part of the prostate remaining when he viewed the area on March 27th. (Ill 585). He had testified that the March 7th operation was designed to remove the entire hypotrophic prostate. (Ill 584–85). Dr. Ill also testified, however, that the failure to remove all of the prostatic tissue was a "very common occurrence" with residents, attending doctors, and well-known urologists. (Ill 609). Further, there is no testimony that what Dr. Ill found were "tags" of tissue.

Dr. Ulm gave his opinion, with a reasonable degree of medical certainty, that the operation described on pages 127 and 128 of Defendant's Exhibit A, performed by Dr. Newman on March 7, 1962, was not a deviation from accepted and established medical standards and procedures. He saw no recorded grounds for criticism. (Ulm 51). Dr. Beisler testified, as well, that, in his opinion, the procedures performed on

March 7th were proper and in accordance with accepted medical practice. (Beisler 622).

The Court finds and concludes that Dr. Newman performed the March 7th operation in accordance with generally accepted medical practice, with the requisite skill, and under appropriate supervision.

II. THE MARCH 27, 1962 OPERATION

A. Was Dr. Ill Unskilled, Inept, and Poorly Trained?

■ The record does not sustain plaintiff's contention that Dr. Ill was unskilled, inept, or poorly trained. Dr. Ill received his M.D. degree in 1955, served his internship from 1955–1956; worked in the field of urology for ten months while in the armed services during the years 1956–1958; served one year assistant surgical residency from 1958–1959; served one year urology residency at Presbyterian Medical Center from 1959–1960; and served two years of urology residency at MVAH from 1960–1962. (Ill 547). Prior to March 27, 1962, Dr. Ill had performed approximately 130 prostatectomies; and about eighty per cent of these were transurethral. (Ill 549).

Dr. Ulm testified that, at the time of the March 27, 1962 operation, Dr. Ill had but two months more to complete in his three year urology training, and concuded: "He was a pretty competent surgeon." (Ulm 121). The urology residency training program at MVAH was under the personal supervision of Dr. Ulm; and it appears from the record that he had obtained approval for the program from the American Medical Association. (Ulm 10–10A). It is also apparent that the residency program at MVAH was deemed proper training for certification by the American Board of Urology (Ulm 10A), as is evidenced by the fact that Dr. Newman is a diplomate. (Newman 514). The Court finds and concludes that Dr. Ill was neither unskilled, inept, or poorly trained.

B. Did Dr. Ill Depart From Generally Accepted Medical Practice and Fail to Exercise His Best Judgment During the Procedure of March 27th?

The thrust of plaintiff's contentions that the procedures of March 27th were deviations from generally accepted medical practice is directed to Dr. Ill's resectioning of additional prostate tissue. He does not claim that Dr. Ill acted contrary to sound medical practice in evacuating the blood clots and irrigating the bladder.

### 1. Dr. Ill's Testimony

Plaintiff offered considerable portions of Dr. Ill's deposition in support of his contention of malpractice. Dr. Ill described plaintiff's condition as poor prior to the operation of March 27th. He noted that plaintiff required transfusion of two units of blood in order to bring his blood pressure up to a level safe enough to administer a spinal anesthetic. (Ill 574). Dr. Ill recalled that the patient was in shock, that he was pale, and that he was complaining from lower abdominal discomfort caused by what proved to be clots in the bladder. (Ill 574). His blood pressure before blood was transfused was seventy-eight over forty and after the transfusion, it rose to ninety over sixty. (Ill 574–75). As noted earlier, plaintiff was observed to have suffered two episodes of bright red bleeding on the morning of March 27th.

Dr. Ill, assisted by Dr. Newman, began this operation at 1:00 P.M. After plaintiff's blood pressure had been raised to normal levels and the spinal anesthesia administered, a resectoscope was introduced with ease. (Deft.Exh. A at 132).

Dr. Ill found considerable mild low prostatic tissue remaining. He did not see any express bleeding point though there was a mild ooze from several areas through the prostatic fossa, especially in the area of the undermined bladder neck. He did see a perforation of the urethra one centimeter distance from the external sphincter (Ill 575); but, upon reflection during his deposition, Dr. Ill could not comment further on this finding. (Ill 583). There was no arterial bleeding, however; just the normal ooze following a transurethral resection. (Ill 575; 576; 583).

Dr. Ill stated that he knew that the patient had "certainly bled"—three units of blood had been administered between March 7th and March 27th. (Ill 576–77). Still, on endoscoping the patient, Dr. Ill saw no explanation for the bleeding, a circumstance he found "puzzling". (Ill 577, 583). He stated that the "results of bleeding" were evident, "but not the bleeding itself." (Ill 583).

Dr. Ill performed no electrocoagulation at that time. He explained that none was necessary nor could any be done because the careful search for the bleeding vessel had been in vain. (Ill 576, 586).

Dr. Ill then decided to resect the additional prostatic tissue—an operation he had not preoperatively planned to do. (Ill 584). Dr. Ill explained that he did not expect to find any residual tissue, nor, upon discovery, did he expect to resect it. However, because he could not find any explanation for the bleeding, he resected the additional tissue. (Id.).

When asked by plaintiff's counsel whether the performance of a second stage resection immediately after a patient is brought out of shock is a departure from general urological practice, Dr. Ill responded:

"If this were my intent upon doing the operation, I agree. This was not my intent but in finding what I did at that time decisions have to be made in the treatment of this particular situation, so a standard does not seem to apply because this is a particular case with particular findings. Intent to go into and do a second stage resection * * * is certainly a departure from standard procedure in the presence of hemorrhage, yes, but this was not the intent upon doing it. The intent was purely to control the bleeding. Bleeding was found and an attempt at finding the cause was carried out by the

performance of the resection and this was a resection in an area which is seldom followed by such difficulty such as this. This is the safe area. This is an area where blood vessels do not abound." (Ill 593–94).

Plaintiff argues that the foregoing testimony establishes that Dr. Ill sought to excuse his performance of a second-stage transurethral prostatectomy by stating that it was not his "intent" to do so. (Plaintiff's Post-Trial Brief at 13–14). The Court does not so interpret Dr. Ill's testimony. As will be more fully explained *infra,* Dr. Ill's testimony does not admit malpractice and attempt to "excuse" it. Rather, this testimony, which evidences the purpose for the resectioning, supports the conclusion that Dr. Ill did not depart from generally accepted medical practice.

### 2. Dr. Davis' Testimony

Plaintiff called Dr. Davis as an expert witness to analyze the facts and render his opinion respecting them. On direct examination, Dr. Davis stated that the operative procedure of March 27th, as described in the doctor's progress notes for that date (Deft.Exh. A at 110), was clot evacuation and second-stage transurethral resection. (Davis 395). He then offered his opinion that the second-stage transurethral resection was contraindicated at that time, which meant "not indicated". (Davis 396).

Dr. Davis also expressed the opinion that the performance of a second-stage transurethral prostatectomy was contrary to standard medical practice. (Davis 397). The basis for this opinion was that the patient had been running a temperature and was febrile at the time and that the procedure was performed as an emergency measure to stop bleeding. Therefore, this was not an appropriate time to remove more prostatic tissue. (Davis 397). It was Dr. Davis' testimony that the second-stage prostatectomy was not an emergency procedure, but was elective surgery. (Davis 398).

On cross-examination, however, Dr. Davis testified that, if he found a pa-

tient bleeding three weeks after a transurethral resection and if the bleeding persisted, he would endoscope the patient, evacuate clots, and look for bleeding points. (Davis 412). He stated he would leave a catheter in the bladder after being assured there was no active bleeding, (*id.*), and by that he meant he would watch the irrigating solution to make sure that it was clear, and he would carefully re-examine the prostatic fossa. He further explained that he *would make observations every few min-utes* to see whether he could, by changing the pressure in the irrigating fluid, actually see a bleeder. (Davis 413).

Dr. Davis admitted that a bleeder might be under necrotic tissue still in the urethra, and that it would be sound medical practice to try and remove some of that tissue if the bleeding was not observed initially. (Davis 413). He expressly stated that it would be reasonable medical practice, standard urological practice for Dr. Ill to remove additional tissue in order to try and locate bleeding, if there was no intention, when the operation was begun, of removing other tissue. (Davis 413–14).

### 3. Dr. Biel's Testimony

Dr. Biel testified that the resection of ten grams of tissue (the amount reported in Deft.Exh. A at 132), "when you are looking for bleeding," was "inadvisable". (Biel 316). However, he would have to have a laboratory report confirming that ten grams had actually been received in this case, before he could state that the March 27th procedure was contrary to generally accepted medical practice. (Biel 316–17). He did not recall seeing such a report in plaintiff's medical file. (Biel 317). Dr. Biel explained that the operative report found in Defendant's Exhibit A at page 132 was prepared by a resident, and that a surgeon often thinks he has resected a great deal more than he actually has. (Biel 319).

Moreover, some tissue resection—and Dr. Biel emphasized the word "some"— may be advisable if the surgeon believes it to be "necrotic tissue" (tissue de-

storyed by electrocoagulation) and thought it might "sluff and disappear." In general, though, "you don't resect any more than you absolutely have to." (Biel 317).

Plaintiff also relies on Plaintiff's Exhibit 11, a Draft of Conclusions prepared by Dr. Biel after reviewing plaintiff's hospital records. It contains the following language:

"There is another suggestion in the EBT [deposition], by Dr. Ill, that in the second procedure [March 27th] when he was unable to find a bleeding point, he resected additional tissue, looking for one. This is tantamount to saying that if you look at one's hand and you don't see any bleeding, you should make some cuts to see if you can find bleeding. It is obvious that further cutting will lead to further bleeding. The patient who was returned for the second time to the operating room because of hemorrhage should not have been subjected to what is characterized both in the doctor's notes and in the operative reports as a second stage transurethral resection. The operator states that he removed approximately 10 grams of tissue and in no circumstances can the removal of this amount of tissue be characterized as anything but a transurethral resection."

Dr. Biel testified that Plaintiff's Exhibit 11 was "perhaps written in haste, written off the top of my head." (Biel 336). It was subject to further study and revision. (Id.). He indicated that he no longer wished Plaintiff's Exhibit 11 to represent his professional conclusions. (Biel 337). Dr. Biel also testified, on cross-examination, that in attempting to stop hemorrhaging and bleeding additional resection might be done. (Biel 348).

Defendant's Exhibit A at 47 is the pathology report for the tissue removed by Dr. Ill on March 27th. It reports that approximately 30 irregular prostatic chips, the largest measuring 2.5 x 0.8 x 0.5 cm. were received. Several of these fragments were lined with necrotic

membranes. The report does not otherwise indicate the amount of tissue received.

### 4. Dr. Beisler's Testimony

Dr. Beisler, one of defendant's experts, gave emphatic, impressive, and convincing testimony on the issue of whether the March 27th procedure was a departure from generally accepted medical practices. He observed that Dr. Ill found no apparent bleeding to account for the degree of bleeding Mr. Lever had shown. Not having found any bleeding during his examination, Dr. Beisler believed that Dr. Ill "would have been open to criticism if he had not resected the residual middle lobe tissue and some of the necrotic tissue, thereby hoping, one, either to seal off any bleeding area that might have been hidden from view, or to bring that area of bleeding which was hidden from view, into view." (Beisler 623).

Dr. Beisler also testified that Dr. Ill apparently saw nothing after that. (Id.). He explained that, very frequently, although a patient bleeds badly and has a bladder full of clots, once the clots are removed and the surgeon completely inspects the area, he will not find any bleeding. A catheter is then inserted and the patient does not bleed thereafter. (Beisler 623–24).

On cross-examination, Dr. Beisler further elucidated the matter. Plaintiff's counsel attempted to paraphrase Dr. Beisler's previously mentioned testimony as follows: "You said that with respect to the operation of March 27th that in eight out of ten cases of hemorrhage you put in a catheter and the bleeding stops." (Beisler 659). Dr. Beisler denied that that was his testimony. He then stated: "I said you put in a resectoscope, evacuate the clots, look around, see no bleeding, and after careful inspection you see no bleeding, you remove the resectoscope, put in a catheter for a couple of days and there is no further bleeding." (Id.).

Apparently, Dr. Beisler was attempting to emphasize that the operating sur-

geon must make a great effort at trying to locate the bleeding, and that the process of "careful inspection" may often require additional resection in order to uncover bleeding vessels.

Dr. Beisler expressed the opinion that the procedures of March 27th were proper and in accordance with accepted medical practice (Beisler 624). He did testify, however, that a second-stage transurethral resection was performed on March 27th, and that shock, a febrile condition, and anemia were general contraindications to a second-stage prostatectomy until they are rectified. (Beisler 660–61).

### 5. Dr. Newman's Testimony

Dr. Newman, in the course of his direct examination by plaintiff (after plaintiff had made Dr. Newman his witness), gave his opinion that a second-stage transurethral prostatectomy was not performed on March 27th, and that the hospital record (Deft. Exh. A at 132) which had so labelled the operation, was in error. (Newman 521–22). He also gave his opinion that, had a second stage operation been performed on Mr. Lever, one which was not planned preoperatively, it would not have been a departure from generally accepted medical practice. (Newman 522). Dr. Newman had stated in his pre-trial deposition that it would not have been proper to go beyond the planned operation because the " 'purpose of the operation was to find the bleeding and correct it, no more.' " (Newman 523).

### 6. Dr. Ulm's Testimony

Dr. Ulm gave illuminating testimony on the question of additional resection, and convincingly explained why no inference of malpractice should be drawn from the presence of the term "second-stage transurethral prostatectomy" on page 132 of Defendant's Exhibit A. Dr. Ulm testified that a second-stage transurethral prostatectomy, as is ordinarily understood by use of the term, was not performed on March 27th. That term was employed for purposes of clarification to other doctors. A second-stage transurethral prostatectomy means "that you go back to do an elective procedure, a scheduled procedure, where the first has been inadequate. This is not what that [the operation of March 27th] was." (Ulm 122).

Plainly, it was Dr. Ulm's testimony that because the surgery performed on March 27th was not scheduled or elective in nature, it cannot be accurately designated as being a "second stage" prostatectomy. That phrase was employed in Defendant's Exhibit A at 132 only to indicate that additional resection had been done "secondary" to the clot evacuation. (Ulm 122).

It appears that the various witnesses interpret the phrase "second stage transurethral prostatectomy" differently. Thus, unless the Court gives content to the phrase by interpolating the meaning ascribed to the term by the witnesses, the significance of the expert testimony which is premised on the presence of that term in the operative report, cannot be accurately gauged. The Court has so analyzed the testimony and views the evidence as establishing that additional transurethral resectioning, if not excessive in amount, when performed on a patient in a febrile, anemic, and recently hemorrhaging condition, is not improper where the procedure was not scheduled or planned, and was performed solely in an attempt at locating the source of bleeding and stopping hemorrhaging.

### 7. Conclusions

■ The Court finds and concludes that the resection of prostate tissue by Dr. Ill on March 27th was not planned or scheduled preoperatively; that it was done solely for the purpose of trying to locate the source of Mr. Lever's hemorrhaging; that resection of prostate tissue in an attempt to locate the source of hemorrhage was in accordance with sound medical practice; that plaintiff has failed to prove by a preponderance of the credible evidence that the quantity of tissue resected by Dr. Ill in an attempt to locate the source of hemorrhaging was so excessive as to be contrary to

generally accepted medical practice; and that the decision to resect additional tissue, and the quantity of tissue actually resected by Dr. Ill on March 27th were matters requiring the exercise of professional judgment, which judgment was not exercised by Dr. Ill on March 27th in a manner contrary to generally accepted medical practice. Neither Dr. Ill nor defendant was guilty of malpractice either with respect to the surgical procedures performed on plaintiff March 27, 1962, or with respect to the duty of care owed to plaintiff up to and including March 27, 1962.

### III. THE MARCH 29, 1962 OPERATION

In order to evaluate more precisely the expert testimony regarding the March 29th procedures, the Court will make additional and more detailed findings of fact.

Plaintiff had a quiet, uneventful day. The drainage from the catheter was clear, yellow urine at 3:00 A.M. (Deft. Exh. A at 94). Following a normal bowel movement, plaintiff was observed to be hemorrhaging at 7:40 P.M. An attempt was made to stop the bleeding by means of a power syringe irrigation and evacuation. This failed. So did the attempt by means of traction on a 30 cc. Foley balloon catheter, and the attempt made by digital compression of the prostate against the catheter through the rectum. The blood loss was estimated at 500 cc. in fifteen minutes. (Deft. Exh. A at 111; Ill 601–02). A catheter was inserted and, at the same time, blood was rapidly transfused. (Ill 596).

At 8:05 P.M., plaintiff was brought to the operating room (Deft. Exh. A at 111). At 8:15 P.M. plaintiff's blood pressure was noted as sixty over forty and the bleeding was continuing. Whole blood was evacuated from the bladder with a Toomey syringe (*Id.*). Plaintiff was in shock, which meant that his blood pressure was low; and he had a rapid pulse. (Biel 306).

Dr. Ill then decided to perform a cystopanendoscopy. At 8:45 P.M., Dr.

Newman reported visualizing a large arterial vessel bleeding in the area of the verumontanum just proximal (on the side nearer to the panendoscope located at the bladder neck) to the external sphincter. (Deft. Exh. A at 111). Dr. Ill reported seeing "two weakly pumping blood vessels just inside the external sphincter." (Deft. Exh. A at 130). He testified that he saw the same thing as Dr. Newman but that the two doctors evaluated the extent of the bleeding differently. (Ill 596–97).

The patient's blood pressure by now had been brought up to 110 systolic. The decision was therefore made to administer a spinal anesthesia to plaintiff. (Deft. Exh. A at 130; Ill 597). Upon placing plaintiff in a sitting position to receive the anesthesia, however, blood was seen to spurt from the urethra. (Deft. Exh. A at 130; Ill 599). That this was fresh blood is apparent from the circumstance that the bladder had previously been cleaned of all clots and had contained no blood, (*id.*), and the further circumstance that fresh clots were reported evacuated from the bladder by means of a resectoscope after the spinal anesthesia was administered while plaintiff was supine and on his left side. (Deft. Exh. A at 129).

After the patient was anesthetized and the fresh clots evacuated, at approximately 9:10 P.M., plaintiff was again observed, this time through the resectoscope. (Deft. Exh. A at 111). A resectoscope offers the surgeon a better view of the area than does the panendoscope. (Ill 597). Panendoscopic viewing does not give the surgeon a good picture of the bleeding. If it is arterial bleeding, the surgeon seldom sees the arteries. (Ill 598).

Upon viewing the area with the resectoscope, Dr. Newman reported finding a large arterial pumper on the floor of the prostate between the verumontanum and the external sphincter. (Deft. Exh. A at 111). Dr. Ill apparently saw the bleeding at the same area as Dr. Newman and again it was his evaluation that there were two bleeding blood ves-

sels. (Deft. Exh. A at 129, 130). Dr. Ill then decided to electrocoagulate the bleeding vessels; and he fulgurated them "extensively". (Deft. Exh. A at 129). He also lightly fulgurated several other areas of mild ooze in the prostatic fossa. (*Id.*). The bleeding ceased almost entirely. A catheter was inserted and another unit of whole blood was transfused. Plaintiff was taken from the operating room in good condition. (*Id.*).

There is no proof in the record that Dr. Newman's report of approximately 2000 cc. of lost blood on the evening of March 29th (Deft. Exh. A at 111) was in error. In the absence of any such proof, the Court accepts this statement as fact and also finds that such blood loss was considerable. (Davis 418).

**A. Was Plaintiff in an Emergency Situation on March 29th?**

Plaintiff contends that Dr. Ill failed to seek assistance from an attending physician and extensively fulgurated the area between the verumontanum and external sphincter upon the mistaken belief that plaintiff was bleeding massively from that area and was in a life-threatening situation. The theory of liability is apparently posited on the premise that plaintiff was not in fact in such an emergency condition and, therefore, that procedures which presented less of a threat to the external sphincter should have been employed. The record, taken as a whole, however, does not support plaintiff's contention that Dr. Ill was mistaken as to the magnitude of the bleeding and the seriousness of plaintiff's condition.

Dr. Davis, the only witness who testified specifically with respect to the possibility of mistaken diagnosis (this contention was not set forth in the Pre-Trial Order and thus was not the subject of extensive inquiry at trial), stated, on cross-examination, that he had reason to believe that the bleeding had not, in fact, been near the external sphincter as Drs. Ill and Newman had reported, because it was difficult for him to conceive of such massive bleeding

from the arteries in the area. (Davis 439–40).

On redirect, he amplified his opinion. The external sphincter, he explained, is relatively avascular in comparison to the remainder of the prostatic urethra. Therefore, in his opinion, bleeding at this point could not cause hemorrhage in the amount of 1000–2000 cc. of blood. (Davis 456). He believed that the doctor who reported that the bleeding vessels were in the area of the external sphincter thus mistakenly judged the bleeding to be coming from that point. (Davis 456–57). There are only small arteries between the verumontanum and the external sphincter, and the maximum blood loss from this area, in ten minutes, would be between 100–200 cc. of blood. (Davis 457).

The Court was generally unimpressed with Dr. Davis' testimony. It was said to be based on his experience and observations as a resectionist. (Davis 440). But he admitted having no recent experience in the emergency control of hemorrhage. (Davis 421). The Court is unwilling to accept his testimony as the sole predicate for a finding that Drs. Ill and Newman, who were physically present at the operation, mistakenly judged that there was massive hemorrhaging from the area of the verumontanum and external sphincter, and that their written report of the procedure and progress notes were similarly erroneous.

In any event, Dr. Davis' testimony does not convincingly establish that plaintiff was not in an emergency situation on March 29th. A close reading of his testimony indicates only that Dr. Davis was of the opinion that the bleeding was not coming from the area of the sphincter. He stated that very often there may appear to be bleeding from a particular point but, because of the size of the prostatic fossa, there could be bleeding from other points. (Davis 423). At no time was he ever asked whether, in his opinion, Dr. Ill and Dr. Newman mistakenly reported the volume

of blood loss; and there is nothing in his testimony which supports an inference that such was his opinion. Thus, Dr. Davis' testimony, even if fully accepted and even if all legitimate inferences stemming therefrom were drawn, establishes only that Dr. Ill mistook the precise location of the bleeding.

However, assuming the Court made such finding of fact, liability does not necessarily follow. The Court has already found that plaintiff lost approximately 2000 cc. of blood and that this was considerable. Since loss of this quantity of blood apparently would be a principal cause of life-threatening emergency (*see infra* pp. 893–894), the mere error (if any) in location does not necessarily mean that plaintiff's life was not in danger.

Moreover, the Court finds that the use of fulguration as an emergency procedure was in accordance with sound medical practice (*see* Part III.C of this opinion), and that the fulguration was skillfully performed. (*See* Part III.D of this opinion).

Since the unrefuted evidence is that Dr. Ill applied electrocoagulating current to the area where he observed the bleeding (Deft. Exh. A at 129), the suppositious mistaken diagnosis of the source of bleeding did not result in harm to plaintiff because it then must also be assumed that the fulguration was not done in the area of the external sphincter.

■ Quite apart from Dr. Davis' testimony, the record manifestly supports the conclusion that plaintiff was in a life-threatening situation on March 29th, and that a principal cause of the emergency was the significant loss of blood.

Dr. Ulm testified that the operation performed on March 29th was "certainly" life-saving, apparently basing his opinion on the volume of blood lost, as reported in Defendant's Exhibit A. (Ulm 151). Moreover, plaintiff had a very low blood pressure at the time bleeding was discovered and was in shock. "That is pretty dangerous in a 74 year old man." (Ulm 125).

Dr. Biel testified that the March 29th procedure would have to be characterized as "life-saving" because the "patient went into shock and they were pouring blood into him." (Biel 347). He also testified that, although the patient's blood pressure was at 110 systolic and in a satisfactory condition for the administration of anesthesia, he was "still bleeding and therefore his life was still in danger." (Biel 354–55).

Dr. Beisler, too, expressed his opinion that the March 29th operation was a life-saving one. (Beisler 628). On cross-examination he was repeatedly asked whether plaintiff was out of danger after the bleeding vessels were observed and before the anesthesia was administered. (Beisler 661–65). A fair reading of the cross-examination and Dr. Beisler's answers discloses that Dr. Beisler's testimony was only that plaintiff's blood pressure had been raised to a level where neither the administration of anesthesia nor the operation itself would be dangerous to Mr. Lever. Dr. Beisler did not testify that, when the anesthesia was administered, Mr. Lever was no longer in danger of dying from continued loss of blood. On redirect, Dr. Beisler clarified the issue and testified that, when he stated that Mr. Lever was out of danger, he was referring to "danger" resulting from the transurethral fulguration to control the bleeding and from receiving anesthesia,—he "didn't mean that the patient was in good enough condition to undergo any open surgery, packing or otherwise, because he was still bleeding * * *" (Beisler 762).

Nor does plaintiff's reference to Plaintiff's Exhibit 11 (Dr. Biel's Draft of Conclusions) furnish support for his contention that there was no life-threatening situation on March 29th. Dr. Biel was referring to the adequacy of time to perform the packing procedure, and not to the seriousness or dangerousness of plaintiff's condition.

### B. Did Dr. Ill Depart From Sound Medical Practice in Failing to Seek Assistance?

Though the record is confusing on these factual questions, the Court concludes that neither Dr. Ulm nor any other member of the attending staff at MVAH was present in the operating room during the operation of March 29th, and that neither Dr. Ill nor Dr. Newman, either personally or through a member of the nursing staff, attempted to seek assistance from more experienced hospital personnel.

Dr. Ill testified initially that he did not know whether he or Dr. Newman called Dr. Ulm with respect to this particular problem. (Ill 510). Upon further questioning, however, he admitted that he made no attempt to get Dr. Ulm because there was insufficient time. (Ill 511).

Dr. Ulm's statement that he was present during the operation of March 29th (Ulm 119) was apparently based on his normal routine and practice in being present in the hospital, and not upon specific recollection. (Ulm 119–20). Dr. Ulm's testimony in this particular respect is implausible because the only established routine and practice that he alluded to was his presence in the hospital during the morning and afternoon (Ulm 120); the procedure of March 29th was performed in the evening.

Having concluded that Dr. Ill in fact made no effort to obtain advice on March 29th, the Court now takes under consideration the question whether such failure was a departure from generally accepted medical practice.

Dr. Newman testified that, during the period when the various operations were performed on plaintiff, attending physicians were physically present in the hospital at all times, no more than fifteen minutes distance from the operating room. (Newman 501–02).

The hospital records disclose that about one hour and thirty-five minutes elapsed from the onset of bleeding until the electrocoagulation. (Biel 296).

Dr. Ill admitted that the hemorrhaging of March 29th was quite a surprise to him. (Ill 606–07). Mr. Lever's case was not standard. (Ill 607). Post-operative hemorrhaging is unusual (*id.*), as was the location of plaintiff's hemorrhage at the verumontanum rather than at the internal sphincter or ceiling of the bladder neck. (Ill 607–08). Dr. Ill testified that he never had seen post-operative hemorrhage from this area.

The Court concludes that, under the foregoing circumstances, the weight of the credible evidence establishes that it was a departure from sound medical practice to have failed to make any effort to seek help by any means.

Dr. Ulm described the general practice at MVAH with respect to seeking aid in the performance of a transurethral prostatectomy. (Ulm 92–93). He stated that the residents could make any decision that they thought was correct but that, if they had any hesitation about the decision, they were to call him, at any time. Dr. Ulm stated that he thus hoped to give residents experience in making decisions but that, where they were unfamiliar with the consequence of a decision or a choice between two alternatives, they were to seek his aid. (Ulm 93).

Dr. Biel also testified as to the general practice at MVAH regarding seeking consultations, based on his experience as a member of the attending staff at MVAH. He stated that it was Dr. Ulm's rule that the resident was obliged to notify an attending physician when the patient was in a life-or-death situation (Biel 351), and under generally accepted urological standards an attending physician should have been notified when the patient was in a life-or-death situation. (Biel 352).

Dr. Beisler testified that, if residents have a problem or are in doubt about a procedure, they usually consult with members of the staff. (Beisler 670). If there was an extreme emergency, the resident must act on his own, however, without consulting or taking time to get

in touch with one of the attending physicians. (Beisler 671). It was his belief that, if Dr. Ill had any questions or doubt in his mind, he would have consulted one of the attending doctors. (Beisler 673).

While there is no testimony regarding whether Dr. Ill was in doubt with respect to the procedures of March 29th, the Court is of the opinion that Dr. Ill was required to make an attempt to seek advice because he was confronted by a patient in a dangerous condition. The Court inquired whether sound medical practice requires a surgeon who finds himself in an unanticipated situation involving grave risk for the patient to discontinue what he is doing and to seek the advice of a senior physician. In response to the Court's question, Dr. Beisler replied that it would be wrong for the surgeon to stop and take time to get advice from a more senior physician. (Beisler 713–14). However, he later explained that the best medical judgment requires a doctor to try and locate assistance (Beisler 714–15; 763), assuming the surgeon does not leave the patient's side and utilizes the nursing staff. Dr. Beisler also made clear that it was his opinion that the surgeon is required only to *try* and locate aid, and that if he does not succeed in a reasonable period of time, the surgeon is then required to use his own judgment. (Beisler 715, 763).

Dr. Ill's failure to seek advice, as plaintiff himself observes (Post-Trial Brief at 61), renders defendant liable only if Dr. Ill then failed to perform the procedures with adequate skill and training or otherwise acted contrary to generally accepted medical practice.

C. Did Dr. Ill Depart From Generally Accepted Medical Practice or Fail to Exercise His Best Judgment in Performing the Electrocoagulation of March 29th?

Plaintiff claims that Dr. Ill departed from generally accepted medical practice and failed to exercise his best judgment when he proceeded to electrocoagulate the bleeding vessels in the area of the external sphincter. Dr. Davis, plaintiff's expert, testified that suprapubic packing of the prostatic fossa was the only remaining alternative procedure to fulguration that Dr. Ill could have employed to stop the bleeding on March 29th. (Davis 419). It is plaintiff's contention that Dr. Ill should have used suprapubic packing rather than fulguration because it is assertedly the more conservative choice since it does not involve risk of damage to the external sphincter.

*1(a). Dr. Davis' Testimony Considered*

Plaintiff relies primarily on the expert testimony of Dr. Davis. On direct examination, plaintiff did not even question Dr. Davis with reference to this issue. The matter was first raised on cross-examination and pursued further on redirect.

It was Dr. Davis' expert opinion that it was contrary to good medical judgment for Dr. Ill to attempt to fulgurate the external sphincter and that proper treatment would include suprapubic packing of the bladder. (Davis 425). Previously he had testified that, generally, if the exact location of bleeding points were determined, and if he were sure that fulguration would, in fact, control the bleeding, he would fulgurate and thus shorten the procedure. (Davis 422–23). Whether it is a question of judgment to fulgurate or attempt to control the bleeding suprapubically, in Dr. Davis' opinion, would depend on the location of the bleeding. (Davis 423). He has never seen an indication for fulguration at the external sphincter. (Davis 423–24). He testified that it would be contrary to proper medical practice, in an attempt to save the life of the patient, once the bleeding was clearly located in the area of the sphincter, to fulgurate in that area. (Davis 434).

In amplification of his opinion, Dr. Davis stated that while he would be hesitant from a clinical point of view (considering that the patient was febrile, anemic, and had had a second episode of hemorrhaging within two days) to endo-

scope the patient on March 29th, this much of the procedure performed by Dr. Ill was not contrary to proper medical procedures. However, as relating specifically to fulgurating extensively at the external sphincter, he testified that the procedure employed by Dr. Ill was contrary to proper medical practice. (Davis 437–39). If there was severe bleeding in the area of the verumontanum and external sphincter, it was his opinion that fulguration in the area would have been contrary to accepted medical practice because of plaintiff's general clinical situation, his course, and the fact that control of hemorrhage by suprapubic packing is simpler and provides less chance of causing incontinence. (Davis 440–41).

Dr. Davis then testified, however, that the choice of surgical procedure is a decision to be made by the doctor who was actually present at the time on the basis of his experience. A doctor who was not present at that time cannot say that what was then done and that the exercise of judgment by the doctor then present, who was familiar with the case, was contrary to proper medical practice. (Davis 441–42).

On redirect, Dr. Davis was asked whether, considering the area where plaintiff was fulgurated, and considering the conservative alternatives, there was room for Dr. Ill to fulgurate in the area of the external sphincter without first exhausting the other, more conservative, alternatives. He answered affirmatively. (Davis 458). Dr Davis reiterated that the more conservative procedure would have been suprapubic packing. (Id.). However, it is a matter of judgment—particularly with an instrument as complex as that used, considering an area as small as the prostatic fossa, entailing an operation that most urologists consider the most difficult that they can perform—to decide when there has been "sufficient hemorrhage or recurrent hemorrhage to decide on other more conservative means of stopping the bleeding." (Davis 459).

Taking into consideration the patient's entire clinical course, his post-operative hemorrhaging, his major episode of bleeding two days previously, his febrile course, his profound anemia, Dr. Davis was of the opinion that the conservative treatment of choice would have been to pack suprapubically rather than to attempt a third major instrumentation and fulgurate. "This is where the judgment comes in." (Davis 464). He then agreed that using a procedure which involves possible damage to the sphincter when a choice such as suprapubic packing is open would be a departure from accepted medical practice. (Davis 465).

On recross, Dr. Davis stated that the entire procedure would be proper if, in the judgment of the doctor performing it, the procedure chosen would be acceptable. (Davis 467–68). However, upon being asked whether this meant that there is room for the exercise of judgment, Dr. Davis replied that with regard to the specific use of this procedure on a general basis, there is room for judgment; but that in this particular case, there is no such room, (Davis 468), and that the doctor who executed the operation performed in this case, consequently, acted improperly. (Davis 469–70). This statement was based on the fact that the patient was rendered incontinent as a result of the fulguration of the external sphincter. (Davis 471).

*1(b). Dr. Davis' Testimony Evaluated*

Dr. Davis, as noted above (*see* Part III.A of this opinion), did not impress the Court as a persuasive or convincing witness. His testimony, as above illustrated, was often internally inconsistent and vascillated between direct, cross, redirect and recross examination. He spent but two and one-half hours reviewing the MVAH hospital record (Davis 448–49) on the day prior to his testifying. (Davis 405).

Dr. Davis offered two distinct grounds of support for his opinion that the electrocoagulation in this case was contrary to good medical practice. The

first was "any standard textbook of urology." (Davis 425). When shown Defendant's Exhibit M for identification, a book entitled *Surgery of the Prostate* by Henry M. Weyrauch, M.D., Dr. Davis recognized the book as a standard textbook. (*Id.*). He thereafter proceeded to read into the record quotations from the book which, in his opinion, supported his statement. (Davis 427–29; 431–32). However, he then admitted that nothing he quoted indicated anything about hemorrhage (Davis 433). The Court's own careful study of the quoted language convinces the Court that the quotations from Weyrauch have no relevance to the question of whether Dr. Ill acted contrary to generally accepted medical practice.

The second ground of support for Dr. Davis' testimony was the fact that plaintiff was rendered incontinent as a result of the fulguration. The significance of this fact as authority for Dr. Davis' opinion is greatly attenuated because Dr. Davis himself testified that he disagreed with the following statement in Weyrauch (plaintiff's Exhibit 2): "Urinary incontinence and sexual impotence do not follow [transurethral prostatectomy] unless gross errors are made." (Davis 443). Yet, unless it was Dr. Davis' opinion that incontinence occurs only if the surgeon errs, a conclusion that the procedure employed was contrary to generally accepted medical practice based on the fact of incontinence, in the Court's view, is not well-grounded.

Nor did Dr. Davis possess a great amount of experience in this area. He had not performed any emergency operation for the control of hemorrhage for at least five years prior to his testimony (Davis 421), and he had been practicing his specialty for only eight years at that time. (Davis 394). Indeed, his opinion that suprapubic packing was the only procedure that Dr. Ill could have properly utilized in this case, is somewhat surprising in view of the circumstance that Dr. Davis has not performed suprapubic packing since his urological residency. (Davis 421).

The inability of Dr. Davis to support his opinion by medical authority, experience, or even logic, persuades this Court to reject his opinion, particularly as it is specifically contradicted by the testimony of the other expert witnesses.

### 2. Dr. Biel's Testimony

Plaintiff sought to use Dr. Biel as an expert witness to establish that the March 29th fulguration was contrary to generally accepted medical practice. Dr. Biel testified that, usually, electrocoagulation in the area of the external sphincter is done with caution; and, if it is possible, the general practice is to avoid that area. (Biel 307–08; 312). In the specialty of urology, this is a cardinal rule. (Biel 314). The reason for this general practice is that fulguration in the area may possibly damage the sphincter. (Biel 313).

Dr. Biel then testified that there were two other procedures which could have been employed to control bleeding. The first would be insertion of a catheter, inflating it in the fossa, and controlling the bleeding by compression. But since fossas are not always exactly the same shape as the catheter, the catheter may not always stop the bleeding. (Biel 314).

The second possibility is to pack the fossa with gauze. Dr. Biel made clear that it was not his opinion that this procedure, or the one described above, will absolutely stop bleeding; he has seen patients bleed through packing. (Biel 314; 354).

Dr. Biel was unable to express any opinion as to which of the three procedures—transurethral electrocoagulation, catheter with Foley balloon, gauze packing—was safest, because he was not in the operating room and did not know how the patient's blood pressure was being maintained. (Biel 315). He stated that there was sufficient time to do the packing procedure, and to call an attending physician (Biel 315, 353), but he could not answer whether packing was "what should have been done under

the circumstances," because he was not there. (Biel 353).

In his opinion, the electrocoagulation performed on March 29th was not contrary to generally accepted urological practice because the patient's life had to be saved. The patient had slipped into shock and was receiving blood transfusions. Under such circumstances, electrocoagulation is an approved method of controlling bleeding. (Biel 315–16).

In the course of plaintiff's attempt to impeach Dr. Biel, the witness gave very convincing and persuasive testimony with regard to the issue of medical judgment. Counsel asked whether it was the witness' testimony that it was not unreasonable for the doctor to have fulgurated in the area of the external sphincter. Dr. Biel replied that there may be circumstances in which one would fulgurate in the area of the sphincter. (Biel 330). He was then asked whether anything in the hospital record indicates that such circumstances were present in Mr. Lever's case, which thus would have permitted Dr. Ill to perform fulguration. (*Id.*). Dr Biel responded that the medical records indicate that plaintiff's blood pressure was sixty over forty. (Biel 331). He continued:

> "* * * and of course, the first thing is to get the clots out and having gotten the clots out there you are looking at these two bleeders, admittedly they are near the sphincter, and I don't know what I would have done if I had been looking at them even though they were near the sphincter I might just have buzzed them (fulgurated them) myself." (*Id.*).

Counsel then asked: "Isn't it a fact, Doctor, that is precisely where you told me [prior to trial] there was no room for judgment, * * * that you pack them?" Dr. Biel replied: "If I said that I was wrong because there is room for judgment." (*Id.*). Dr. Biel adhered to his testimony that the choice of procedure was a matter of judgment for the operating surgeon. (Biel 347; 355; 358).

### 3(a). Dr. Ill's Testimony Considered

Dr. Ill testified that, after performing various techniques to stop the bleeding (*e. g.*, power syringe irrigation; traction on a Foley balloon catheter; digital compression) in vain, he decided that the patient had to undergo either closed or open control of his bleeding, and by that he meant either a transurethral procedure or, if necessary, an abdominal operation. In order to determine which procedure would be required, the patient was taken back to the operating room and was panendoscoped. (Ill 589–90). Other methods of controlling bleeding had been tried and failed; except for "open surgery which is questionable and far more major and serious" no other means remained except fulguration. (Ill 601).

Dr. Ill explained what would be entailed in doing an abdominal operation. (Ill 602). He concluded that the proper order in which to treat plaintiff was first to try fulguration with cystoscopy. (Ill 602–03). Had the alternative of abdominal surgery been tried and had failed, there would have been far greater stress to the body and in a man in a "shocky condition" the stress would have been concentrated. (Ill 603).

### 3(b). Dr. Ill's Testimony Evaluated

Plaintiff emphasizes that Dr. Ill, in the course of his testimony, stated that he was "well aware" that, at the time he was fulgurating, he was destroying Mr. Lever's sphincter and thereby rendering him incontinent. (Ill 603). Dr. Ill did not testify in person; his credibility cannot be determined on the basis of his demeanor on the stand. His statement that he was well aware that he was destroying plaintiff's sphincter is somewhat inconsistent with his prior statement that the fulguration that he did in the area of the external sphincter "very definitely" could have caused the destruction of the sphincter, but he is "not sure it did." (Ill 601).

Dr. Ill's testimony, taken as a whole, establishes that he was fully aware of the suprapubic procedure, but in his judgment the choice of performing open

abdominal surgery in order to pack the area created greater risk of loss of life for the patient. There is support in the other expert testimony that Dr. Ill's choice of procedure, after weighing the risks of loss of life and incontinence, was not an improper exercise of judgment, and, indeed, was the appropriate choice under the circumstances. This testimony impressed the Court as credible and persuasive; and the Court accepts it.

### 4(a). Dr. Beisler's Testimony Considered

It was Dr. Beisler's expert testimony that the electrocoagulation of March 29th, though done on arteries located near the external sphincter, was not a departure from generally accepted medical practice. He noted that plaintiff was in obvious shock and that two units of blood were administered rapidly; and he concluded that the doctors who performed the procedure of March 29th would have been criticized had they done open surgery on a man in that condition. (Beisler 625-26).

Dr. Beisler was then asked to assume that plaintiff's external sphincter was injured during the attempt to stop the patient's bleeding, and whether, in that circumstance, the fulguration would have been a departure from generally accepted medical practice. Dr. Beisler answered that it would not have been a departure because he did not believe that Mr. Lever could have been operated on from "above" [suprapubically] and had they operated from above, he did not think that they would have been able to control the bleeding by means of packing. (Beisler 628).

Dr. Beisler elaborated upon his opinion during cross-examination. He stated that the procedure performed by Dr. Ill was the most conservative procedure which would have guaranteed stopping plaintiff's hemorrhaging. (Beisler 677). Apparently, this was a reflection of Dr. Beisler's view that gauze packing does not always control hemorrhage. (Beisler 760). He stated that plaintiff's condition was not good enough to permit open

surgery, packing or otherwise. (Beisler 762). The patient was still bleeding. It would have taken time to remove the resectoscope and to prepare for the open operation. On the other hand, Dr. Ill was already at the points of bleeding and thus could coagulate them electrically with no further delay. (Id.).

### 4(b). Dr. Beisler's Testimony Analyzed

The Court was persuaded by Dr. Beisler's explanation of why fulguration, rather than open surgery, was the treatment of choice. The witness' careful analysis based on a thorough knowledge of the hospital records in this case was most convincing. Moreover, the Court was impressed by the fact that Dr. Beisler formulated his opinions on the basis of the hospital records and not merely theoretically. His opinions also reflected long experience in dealing with hospital patients. The Court accepts his testimony as reliable and indicative of general urological practice in the New York area.

Plaintiff suggests that the Court reject Dr. Beisler's opinion that suprapubic packing could not have reached the area of the bleeding (Beisler 628) because Dr. Beisler was probably misled as to the location of the bleeding inasmuch as he testified that Dr. Ill had "proved" that plaintiff was bleeding from the *urethra*. (Beisler 676).

The Court is of the opinion that the thrust of Dr. Beisler's testimony was that the choice of fulguration rather than suprapubic packing was in accordance with generally accepted medical practice because it would control bleeding more rapidly and more certainly, and not that the alternative of suprapubic packing was unavailable.

Furthermore, it is not that apparent that Dr. Beisler was testifying under any erroneous assumption as to the location of the bleeding. Throughout his testimony, Dr. Beisler stated the location of the source of the bleeding as it was reported in the hospital record. (Beisler 626, 664-65, 686). His statement that the bleeding was coming from

the urethra must be interpreted to mean "the urethra, as distinguished from the bladder." His testimony, taken as a whole, convincingly establishes that electrocoagulation of bleeding vessels in the area of the sphincter performed on a patient whose life is in danger is not a departure from generally accepted medical practice, and that, in the circumstances of this case, was the proper choice of treatment.

### 5. Dr. Ulm's Testimony

Dr. Ulm's testimony, like that of Dr. Beisler, strongly supports the conclusion that the procedure employed by Dr. Ill was the proper procedure under the circumstances of this case, and not a less preferable alternative procedure (as urged by plaintiff) which a doctor in the exercise of his best judgment might have employed.

When asked whether packing was an "alternative" to fulguration in the area of the external sphincter, Dr. Ulm replied that in this case it was not because the patient was in a "desperate condition." (Ulm 105). The first thing to do was to ascertain where the patient was bleeding. (Id.). This was accomplished in this case through instrumentational observation. Once the bladder is evacuated of clots, as was done in this case, there is "no point in taking the man back to the operating room and doing a major operation on him, opening his bladder with the shock and mortality associated with that procedure when you can control the bleeding with an electrical instrument such as this [i. e., the resectoscope], and it would be a rare urologist who, confronted with bleeding from a transurethral resection, would attempt to go suprapubically rather than transurethrally." (Ulm 105–06).

Dr. Ulm then explained that the established procedure at MVAH is, first, to try and control the bleeding panendoscopically. If the bleeding is massive and does not respond to panendoscopic handling, the bladder is then opened. (Ulm 106). The surgical procedures used in this case were the ones Dr. Ulm would also have used under the same circumstances. (Id.)

Dr. Ulm's testimony is persuasively supportive of that of Dr. Ill with respect to the choice of treatment. At the very minimum, his testimony is indicative that there was at least one school of thought which was of the view that electrocoagulation was the treatment of choice for all bleeding from transurethral prostatectomy.

Dr. Ulm admitted that his opinion assumed that fulguration would not destroy the external sphincter. (Ulm 106). But it was his opinion that fulguration can never destroy the external sphincter because it is superficial and is done under water. (Ulm 106–07).

### D. Did Dr. Ill Perform the Electrocoagulation in a Faulty and Unskilled Manner?

Plaintiff's contention that Dr. Ill performed the electrocoagulation improperly was not set forth in the Pre-Trial Order; and no significant amount of testimony was taken with specific reference to this issue. In order to make findings of fact with respect to this issue, the Court was required to cull from the record testimony directed toward other matters (mainly the issue of causation) which implicitly bears upon this contention. As a consequence, the testimony how to be discussed may, at times, appear inapposite and haphazardly presented. A background note relating to a development at the trial, and a more detailed analysis of this contention, may be helpful in comprehending this branch of the Court's opinion.

At trial, by questions put to defendant's witnesses on cross-examination, plaintiff sought to bolster his contention that Dr. Ill's fulguration in the area of the external sphincter resulted in the destruction of the sphincter and thereby caused plaintiff's incontinence. However, both Dr. Ulm and Dr. Beisler testified that, in their opinion, fulguration in the area of the sphincter would not destroy the sphincter or cause incontinence. (Ulm 103, 106, 112, 113; Beisler

677, 766). Plaintiff then developed his theory, which incorporated the foregoing testimony into the following syllogism (which, though never articulated, is implicit in plaintiff's Post-Trial Brief): fulguration, if done properly (*i. e.*, lightly), will not damage the external sphincter; and, since the sphincter was damaged through fulguration, the fulguration must have been done improperly.

The Court will examine the evidence plaintiff offers in support of this theory.

*1(a). The Testimony Considered: The Technique and Effects of Fulguration*

Dr. Ulm briefly described the process of fulguration. The procedure is executed by the same instrument which the surgeon used to perform the transurethral resection—the resectoscope. (Ulm 30). Instead of a "cutting" current running through the wire loop, the surgeon employs a high frequency "burning" current (*id.*); and the electricity dries and chars the blood vessel, thus causing shrinkage and closing, thereby stopping the bleeding. (Ulm 107). The entire process is performed under water and is superficial. (*Id.*).

Dr. Ulm testified that, if the loop through which the fulgurating current flows is held a distance from the spurting blood vessel, the electricity will, literally, run along the stream of blood into the vessel, thus causing it to shrink and close. (Ulm 107). This method of electrocoagulation is regarded as a superior technique. (Ulm 111–12). The surgeon must learn to keep the loop away from the blood vessel itself. (*Id.*). Apparently, this is so because the current in the loop will not have any effect if the loop were directly in contact with the patient's body; in Dr. Ulm's opinion, pressing the entire loop against the patient's body would dissipate the current through the length of the loop. (Ulm 111).

Dr. Beisler testified that, when fulgurating, the surgeon holds the current in the vicinity of the streaming blood or touching the area of the bleeding vessel.

(Beisler 626). The surgeon need not apply much current to stop bleeding. (*Id.*). He stated that coagulating current does destroy some tissue if the current is applied for a long period of time and if the electrode is applied directly to the body. (Beisler 685). The current will go a little beyond the point of application (Beisler 686), but Dr. Beisler did not believe that when Dr. Ill fulgurated "extensively" near the external sphincter there was a "ready and present danger of destroying the sphincter" (Beisler 665), because "[f]ulgurating current doesn't go very deep." (*Id.*).

It was Dr. Biel's testimony that tissue death does result from the process of fulguration. (Biel 299). The amount of destruction depends on the strength of the current and the length of time the wire remains in contact with the tissue. (Biel 300). The current is not confined to the end of the wire. It may spread in an inverted "V" fashion from the point of contact. (Biel 300–01). But it was Dr. Biel's testimony that tissue destruction does not vary with the distance from the loop to the tissue because " * * * you cannot fulgurate without [the loop] being in contact [with tissue]. It has to actually be in contact." (Biel 301).

*1(b). The Testimony Considered: Dr. Ill's "Extensive" Fulguration*

The only evidence which bears directly on the question of the technique actually employed by Dr. Ill on March 29th, is that stemming from Dr. Ill. Of most particular significance is the operative report of his procedure of that date wherein he states (Deft. Exh. A at 129): "The prostatic fossa was fulgurated extensively in the area where the two blood vessels had been seen." His deposition testimony throws some, albeit rather confusing, light on what he meant by that statement:

"In extensively fulgurating you are destroying tissue and increasing the distance from the point where you're fulgurating. * * * It depends on the time length at which you are fulgurating in addition to the degree of

frequency [of the coagulating current]. If you touch a lesion you won't get any depth at all, and if you lean and persistently fulgurate you will destroy tissue at an increasing distance from the point of contact the longer you fulgurate." (Ill 600–01).

Dr. Ill declared that the surgeon has to fulgurate as long as is necessary to control the bleeding, and therefore that tissue damage can result at a place "quite far" from the area where the current is applied. (Ill 601). When asked if the fulguration he did could have caused destruction of the external sphincter, Dr. Ill replied: "Very definitely." (*Id.*).

### 2. The Testimony Analyzed

The Court's analysis of Dr. Ill's discussion of fulguration results in the following factual conclusions:

(1) While performing the fulguration, Dr. Ill kept the loop in actual contact with the bleeding vessels;

(2) When Dr. Ill reported that he "extensively fulgurated" the area of the external sphincter, he was attempting to describe the length of time that he had the loop in contact with body tissue, and not the expanse of tissue area to which he applied the loop, nor the intensity of the coagulating current he applied; and

(3) Dr. Ill fulgurated only until he was certain the bleeding had been stopped.

Plaintiff asserts that the evidence establishes that Dr. Ill "leaned and persistently fulgurated" instead of "lightly" touching the vessel or the stream of spurting blood. The Court does not so read Dr. Ill's testimony. Dr. Ill was merely describing the destructive effect on body tissue of varying degrees of fulguration—"leaning and persistently fulgurating" being at the opposite end of the spectrum from mere "touching." But even if the Court were to accept plaintiff's assertion, the preponderance of the credible evidence does not establish that to be an improper technique when done to stop life-threatening bleeding.

The Court cannot and does not infer from the next preceding subheading that the technique of fulguration there described by Drs. Ulm and Beisler —i. e., that the electrode is placed in the blood flow only—is the only approved technique. Dr. Ulm, an outstanding urologist of vast experience, testified that the technique he described was regarded as "superior." His testimony supports the inference, which the Court believes warranted, that the technique which involves directly placing the loop on the tissue to be acceptable, though not "superior" because there would be a lessening of the coagulating effect. (Ulm 112). A doctor is not guilty of malpractice because his performance was not equal to that of a surgeon possessed with "extraordinary learning and skill." The law requires only that the doctor perform with the skill of an average practitioner of his specialty. E. g., Pike v. Honsinger, 155 N.Y. 201, 209–210, 49 N.E. 760, 762 (1898).

Moreover, Dr. Biel's testimony—that the loop must be in contact with tissue in order for the surgeon to perform fulguration—evidences that a technique employing direct contact and some inevitable tissue death does not contravene generally accepted medical practice.

Nor is there anything in the record which supports the contention that Dr. Ill's technique was faulty because of the length of time that he kept the loop in contact with tissue—i. e., "extensively." Dr. Ill fulgurated "extensively" because that was the amount of time that was necessary in order to control the bleeding. There was no testimony that this was medically unreasonable. Indeed, no expert was given an appropriately framed hypothetical question and asked to offer his opinion as to whether the hypothesized technique was performed in a manner contrary to (or in accordance with) generally accepted medical practice.

Dr. Ill's use of the term "extensively" in the context of fulguration does not give rise to a situation where the trier of fact, in the absence of expert testimo-

ny, can independently determine whether the procedure (assuming it was performed as described) was executed in a manner contrary to generally accepted medical practice. If the Court were to draw some inference or make any finding of fact in the absence of illuminating relevant expert testimony, it would have to conclude that the procedure was properly performed. Dr. Beisler, who studied the hospital records and Dr. Ill's complete deposition, testified that he saw nothing in these records to indicate that the fulguration was performed improperly. (Beisler 677). In the absence of anything other than circumstantial logic, the Court concludes that Dr. Ill's electrocoagulation was skillfully and properly performed.

## IV. THE MAY 22, 1962 OPERATION

After the operation of March 29th, plaintiff was incontinent. (Ulm 70). Plaintiff was instructed to perform certain exercises in order to try and improve the muscle tone of the sphincter. These exercises consisted of volitional stopping and starting during urination and similar control exercises during defecation. (Newman 478). Plaintiff himself did not recall being instructed, though he did remember receiving suggestions. (Lever 253-54).

Dr. Newman testified that Mr. Lever complained of multiple aches and pains in the groin area during his hospital stay. (Newman 486). The hospital records, however, do not contain any notation of such complaints, though there are entries relating to the giving of enemas for constipation complaints. (Newman 492). Dr. Newman explained that constipation complaints and complaints of aches and pains in the groin might be attributable to hernias. (Newman 490, 492).

Dr. Ulm and Dr. Ill suggested to plaintiff sometime after March, 1962 that, because of plaintiff's complaints referrable to the area of the hernias, the hernias should be repaired. (Newman 493). Plaintiff was apparently agreea-

ble that they should be removed. (Ulm 68).

Mr. Lever also complained about his incontinence to Dr. Ulm. (Ulm 64, 68). He told Dr. Ulm that the incontinence was really bothering him and he would like it cured. (Lever 238). Dr. Ulm decided that he would make an attempt to cure this condition. (Ulm 68). He testified that he examined plaintiff thoroughly, talked with him many times, and discussed plaintiff's case with his colleagues. (*Id.*). The presence, and planned removal, of the two large inguinal hernias gave Dr. Ulm the basis for the surgical procedure actually performed on May 22nd. (Ulm 68-69).

### A. Was There a Proper and Informed Consent to the Operation of May 22, 1962?

The operation of May 22, 1962 involved a suprapubic cystostomy, the repair of bilateral inguinal hernias, and attempted incontinency repair by forming a sling of the spermatic cords under the urethra. In the course of this operation, a bilateral orchiectomy was performed. (Deft. Exh. A at 134-35). The authorization for this operation is Defendant's Exhibit A at page 13. Plaintiff there indicated his consent to have a "bilateral herniorrhaphy and incontinence repair" performed.

Plaintiff contends that, since the term "bilateral orchiectomy" (or words conveying that information) were not included in the authorization signed by Mr. Lever, Dr. Ulm departed from generally accepted medical practice and committed an assault and battery in performing a bilateral orchiectomy.

Plaintiff testified that Dr. Ulm, in all of their "dealings" "never" mentioned that his testicles would be involved in this operation. (Lever 201, 245). He also testified that Dr. Newman did not tell him that Dr. Ulm would have to remove his testicles during the course of the operation. (Lever 245, 777). Nor did either Dr. Newman or Dr. Ulm explain how they were going to repair his hernias (*id.*), or spend hours discussing

the operation to be performed on him with him. (Lever 245, 246).

Plaintiff's testimony on this issue was contradicted in all material respects by the testimony of both Dr. Ulm and Dr. Newman. Plaintiff's testimony on this issue, and his testimony generally, was unimpressive, unconvincing and not credible because it was highlighted by complete and partial failures of recall. The Court gathered the distinct impression from Mr. Lever's testimony and his manner of testifying at the trial that he could remember very little of the details of his hospital stay at MVAH, and almost nothing of his conversations with the MVAH staff. Plaintiff's allegedly very definite memory of never having been informed of the planned orchiectomy is suspect and cannot be accepted in light of his poor recollection with respect to almost every other material question put him. Insofar as Mr. Lever's testimony is contradicted by that of Drs. Newman and Ulm, it is rejected. Mr. Lever is regarded by the Court as an unreliable and untrustworthy witness.

### 1. Dr. Ulm's Testimony

Dr. Ulm recounted his conversations with Mr. Lever with respect to the May 22nd operation. He stated that they discussed it at length. (Ulm 75, 129). He testified that he told Mr. Lever that operations for the correction of incontinence were speculative and that surgeons rarely succeeded. (Ulm 74–75). Dr. Ulm told Mr. Lever that he had tried many of the various types of operations and had developed a number of them himself. He exhibited to plaintiff some of the appliances which are inserted into the urethra to correct incontinence; some of these, he told plaintiff, he had developed himself. And he told plaintiff that, in practically all of these cases, he had failed to correct the incontinency condition. (Ulm 75).

Dr. Ulm further testified that he told plaintiff that, since he had two large hernias and had no use for his testicles, the surgeons would remove his testicles, cure his hernias and use the spermatic cord muscles as slings. (Ulm 76). Dr. Ulm testified that Mr. Lever, in response to the direct question concerning his sexual life, told him that he had no sexual relations at all and had no intention of having children. (*Id.*).

Dr. Ulm admitted, on cross-examination, that he never told plaintiff that the operation he was proposing to perform for the repair of incontinence had never been reported in medical literature (Ulm 129), but he testified that he did discuss with Mr. Lever the various techniques used to correct urinary incontinence and stated that, at the time he spoke with Mr. Lever, he was thoroughly familiar with the Berry procedure. (Ulm 132–33). He apparently could not recall whether, in fact, he discussed the Berry procedure with plaintiff. (*Id.*).

Dr. Ulm reiterated that he told plaintiff that he would remove his testicles in the operation of May 22nd. (Ulm 147). He also testified that he "invariably" removed the testes on an elderly man in the course of herniorrhaphy, and that he informed plaintiff that he would remove the testes even if he repaired the hernias alone. (Ulm 148).

### 2. Dr. Newman's Testimony

Dr. Newman testified that he discussed the May 22nd operation with Mr. Lever. (Newman 478). He stated that he and Dr. Ulm explained the operation to plaintiff and informed him that, in the course of the operation, his testicles would be removed. (Newman 479, 481, 482, 483, 494). Dr. Newman stated that this explanation and information were given to plaintiff a day or two before surgery. (Newman 483).

Dr. Newman testified that Mr. Lever subsequently came to him at the completion of rounds and asked him in greater detail about the planned operation. Dr. Newman testified that he told him exactly what had been told plaintiff earlier —that they would fix the hernias, probably sacrifice the testicles, and since he was incontinent, they would employ the spermatic cords in a sling as a means of attempting incontinency repair. (Newman 484). Dr. Newman recounted that

plaintiff then asked whether the removal of his testicles would permit him to have sexual relations. Whereupon Dr. Newman advised him that, while he could have relations, he could no longer have children. (Newman 584–85).

*3. The Expert Testimony*

Dr. Davis testified that the general medical practice is to have the consent to an operation so worded that the patient understands what the procedure will entail. (Davis 403). His medical opinion with respect to the authorization for the May 22nd operation (Deft. Exh. A at 13) was that it did not adequately describe (from the medical point of view) the operation to plaintiff. (Davis 403). In order for the authorization to conform to generally accepted medical practice, the words "bilateral orchiectomy" should have been included. (Davis 404).

On cross-examination, however, Dr. Davis stated that the authorization in this case would have been medically acceptable if, before the operation was performed, the patient was given an oral explanation of the operation. (Davis 452).

Dr. Beisler also gave his expert opinion that the authorization for the operation of May 22nd would have been a sufficiently informative consent to an operation for hernia and incontinence repair involving a bilateral orchiectomy if the removal of the testicles had been previously explained to the patient. (Beisler 630–32). He stated that the authorization for the May 22nd operation was a proper one (Beisler 630), apparently because an oral explanation had been given the patient, though it would have been best to have the removal of the testicles explicitly stated in the body of the authorization. (Beisler 658).

*4. Conclusions*

■ The Court finds and concludes that Mr. Lever was given a full and detailed explanation of the operation performed on him May 22, 1962—which operation was to include a bilateral orchiectomy—and that he consented to that operation knowingly and fully informed. The Court finds and concludes that the authorization for the May 22, 1962 operation was proper and in accordance with accepted medical practice and standards because plaintiff was given a detailed oral explanation of the operation prior to his signing the authorization.

B. Was the Operation Performed May 22, 1962 a Departure From Generally Accepted Medical Practice?

*1. The Bilateral Orchiectomy as Incident to the Herniorrhaphy*

■ The Court rejects, as against the weight of the credible evidence, the plaintiff's contention that Dr. Ulm's removal of plaintiff's healthy testicles was contrary to generally accepted medical practice.

Dr. Ulm testified that, when he performs herniorrhaphy on an elderly man, he removes the testes almost "invariably." (Ulm 148). This is so because a surgeon thus achieves a "tighter closure of the ring [*see* Defendant's Exhibit F, figure 3, position number 57]" and a more secure herniorrhaphy. (Ulm 153).

Dr. Davis, plaintiff's expert, testified that there is a medical basis for removing the testicles in order "to better repair the hernias," and to make the hernia operation easier. (Davis 444).

Finally, Dr. Beisler also referred to the usual practice of sacrificing the testicles and spermatic cords in repairing direct inguinal hernias, thus obtaining a good repair. (Beisler 635–36).

*2. The Spermatic Cords Sling Operation for the Repair of Incontinence.*

■ The Court rejects, as well, the plaintiff's contention that the operation performed by Dr. Ulm for the repair of plaintiff's incontinence was contrary to generally accepted medical practice, and finds (1) that the operation had a sound basis in medical theory and history; (2) that the surgical details of the operation to correct plaintiff's incontinence were matters requiring the exercise of judgment by the operating surgeon; and (3)

that Dr. Ulm performed the operation for the repair of plaintiff's incontinence skillfully and with reasonable care and did not fail to exercise his best judgment.

Plaintiff's contention appears to be based on the circumstances that the operation had never before been performed; that it had not been reported in medical literature; and that Dr. Ulm had failed to perform a procedure which had been employed previously and reported in medical literature—*e. g.*, the Berry prosthesis operation.

#### a. Dr. Davis' Testimony

Plaintiff relies on Dr. Davis' expert testimony in support of his contention. Dr. Davis testified conclusorily that the operation of May 22, 1962 was contrary to generally accepted medical standards. (Davis 399). There is a school of medical thought which teaches the general category of sling operations, he noted, but none that teaches the particular operation performed. (Davis 399–400). The operation performed is not a standard operating procedure; it is not reported in medical literature and Dr. Davis never heard of such an operation. (Davis 400).

He testified, however, that there is a basis for the operation performed by Dr. Ulm in that the spermatic cords were used as a sling to compress the urethra which is similar in theory to other numerous attempts to use muscles and fascial connective tissue structures in such a manner. (Davis 400–01).

On cross-examination, Dr. Davis testified that the instant operation was not significantly different from other sling operations except that it used the spermatic cords. (Davis 450). He repeated this on redirect examination. (Davis 465). The choice of tissue to use in the operation, Dr. Davis stated, depends on the medical judgment of the surgeon and the exigencies of the particular patient. (Davis 451). Dr. Ulm, in the exercise of his judgment, decided to use the spermatic cords. (*Id.*).

On redirect, Dr. Davis testified that the only basis for using the spermatic cord as a sling was that the muscular wall of the spermatic cord might be used instead of other muscles. (Davis 465). The operation performed on May 22nd was a departure only insofar as it required the removal of the testicles and specific use of the spermatic cords. (Davis 466).

Dr. Davis then amplified his opinion somewhat. The use of the spermatic cords as a sling was a departure because it required the removal of the testicles, and because the tissues composing the spermatic cord do not consist solely of muscle, but include blood vessels, lymphatics, and a portion of the vas deferens. (Davis 466–67). As far as he knows, the spermatic cords have never been used for the purpose of supporting the urethra. (*Id.*).

Dr. Davis did testify, however, that the spermatic cords would not have been of any use to plaintiff after his testicles were removed. (Davis 451). And, as noted previously, Dr. Ulm and Dr. Newman testified that they had told plaintiff that his testicles would be removed even if the only operation to be performed upon him was the herniorrhaphy. Thus, Dr. Davis' opinion which appears to be based substantially on the fact that use of the spermatic cords required removal of the testicles is, at least partially, inapposite. Moreover, the mere fact that a particular structure (*i. e.*, the spermatic cord) had not previously been utilized as the muscle in a sling operation, does not *per se* make its employment a departure from generally accepted medical practice, if the use of that structure is not injurious to the patient and has a sound basis in medical theory and technique.

Defendant's experts convincingly establish that the use of the spermatic cord, under the circumstances of this case, and in light of the general medical history relating to incontinency repair operations, was in accordance with generally accepted medical practice.

### b. The Relevant Medical Background

Both Dr. Ulm and Dr. Beisler testified as to the general medical background in the field of incontinency repair.

Dr. Ulm testified that "[a]ll operations for correction of incontinence are unreliable. Occasionally we succeed in correcting it, but usually we don't." (Ulm 68). Many different operations have been attempted and devised. (Id.). Dr. Ulm testified that he told Mr. Lever that operations for the repair of incontinence were speculative and that surgeons rarely succeeded. Dr. Ulm himself tried and developed a number of operations utilizing appliances in the urethra. (Ulm 75).

Dr. Beisler described the various operations which attempt to repair incontinence. Practically all, he stated, are based on elevation of the urethra in the membraneous portion in order to achieve pressure and thus cure the incontinence. (Beisler 634). The degree of success of all of these operations is "very, very low." (Beisler 635).

On cross-examination, he amplified his prior testimony: "Some degree [of success] is very, very small, sir. I don't think there is a ten percent chance with any one of the operations. Men who have started one operation have switched to another, although they have had success with one or possibly two cases, then they had failures with the others they have tried, so then they go over to something else." (Beisler 640).

Dr. Beisler agreed that the purport of his testimony was that, because of the low rate of success in all urinary incontinency operations, there is no operation that could be characterized correctly as a "standard operation." There is no operation to repair incontinence recognized by the profession as sufficiently productive of success in a sufficient number of cases as to make that operation the standard procedure. (Beisler 642).

Dr. Beisler disputed Dr. Berry's purported claim of nearly 50 percent success with his operation, which claim was pur-portedly made in an article in the May, 1961 issue of the Journal of Urology. (Plaintiff's Exhibit 4 For Identification). (Beisler 644, 645, 646, 650). He testified that Dr. Berry personally told him that he had an 18 percent degree of success. (Beisler 644). Dr. Beisler does not know whether this latter percentage figure is correct; he has no personal knowledge of any successful Berry operations performed by Dr. Berry in the New York area. (Beisler 647, 651–52).

The Court believes Dr. Beisler's testimony respecting the lack of a standard operation due to the low rate of success in the field significant. It illustrates why Dr. Ulm cannot be faulted for developing a variation of existing operations—a variation which retains the essence of the apparently sound medical theory which underlies all of the sling operations—in the hope that perhaps this variation will have a greater likelihood of success.

### c. The Spermatic Cord Sling

Dr. Beisler testified that the surgical techniques and principles exemplified by Dr. Ulm's operation were substantially the same as those employed in the other operations. (Beisler 637). He offered his opinion that the techniques and procedures performed on May 22nd were in accordance with good medical practice. (Beisler 639). While the opportunity to use the spermatic cord does not present itself too often, Dr. Beisler was of the opinion that its use was based on sound background. (Beisler 638).

Dr. Ulm testified that the muscle he employed in performing the sling operation—the cremasteric third muscle of the spermatic cord—is similar in character to the muscles ordinarily used. (Ulm 76). These others are: (i) abdominal muscles; (ii) a strip of the rectus sheath; (iii) a strip of the flat muscles of the abdomen; or (iv) a strip of the aponeurosis. (Ulm 151). By utilizing the spermatic cords, Dr. Ulm explained, he was able to do the sling operation while sparing plaintiff unneces-

sary mutilation of the abdomen. (Ulm 152).

The Court finds and concludes that the use of the spermatic cords as a sling in an attempt to cure incontinence, was not contrary to generally accepted medical practice, notwithstanding its novelty, and that Dr. Ulm's choice of the spermatic cord muscles as the operative tissue, was an appropriate exercise of professional judgment. Dr. Ulm used due care and reasonable skill in the performance of the operation.

## V.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

Judgment shall be entered dismissing the complaint on the merits with costs to defendant.

So ordered.